Filed 3/2/22  P. v. Ortiz CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | H046704 |
| Plaintiff and Respondent, | (Santa Clara County Super. Ct. Nos. C1483831 & 214496) |
| v. | |
| FIDADELFO ORTIZ, | |
| Defendant and Appellant. | |

A jury convicted appellant Fidadelfo Ortiz of second degree murder for shooting the driver of an automobile after a minor traffic incident.  For this crime, the trial court sentenced Ortiz to 15 years to life in prison, plus 20 years consecutive for using a firearm.  In a separate case, Ortiz pleaded no contest to assault by means of force likely to cause great bodily injury.  Pursuant to a plea agreement, the trial court imposed a four-year sentence, concurrent to Ortiz's murder-conviction sentence.

On appeal, Ortiz raises two evidentiary errors related to his murder conviction.  He contends the trial court erred by admitting a statement of the deceased as a "dying declaration" and, relatedly, that the court's error violated the Sixth Amendment's confrontation clause.  He further asserts the trial court erred by permitting evidence about his nicknames and that the cumulative prejudice from both trial court errors violated his right to a fair trial.  Finally, in supplemental briefing on a recent change in the law, Ortiz

asks us to order amendment of the judgment to vacate a criminal justice administration fee imposed at his sentencing.

For the reasons explained below, we modify the judgment for Ortiz's murder conviction to vacate the unpaid portion of the criminal justice administration fee. We reject Ortiz's remaining claims of error and affirm the judgment in all other respects. Further, we do not address the judgment arising from Ortiz's assault conviction for want of appellate jurisdiction.

## I. FACTS AND PROCEDURAL BACKGROUND

A. *Procedural History*

In March 2015, the grand jury of Santa Clara County returned a 34-count indictment charging appellant Ortiz and 23 other individuals (case No. 214496). The indictment was subsequently amended, and, in December 2017, the Santa Clara County District Attorney filed a third amended indictment (hereafter indictment) against the same 24 people. That indictment alleged five crimes against Ortiz: Street terrorism (Pen. Code, § 186.22, subd. (a)[1]; count 1), attempted murder (§§ 187, 664, subd. (a); count 2), shooting at an occupied vehicle (§ 246); count 3), assault with a firearm (§ 245, subd. (a)(2); count 4), and conspiracy to sell methamphetamine (§ 182, subd. (a)(1); Health & Saf. Code, § 11379, subd. (a); count 12). The indictment further alleged that Ortiz committed the offenses charged in counts 2, 3, 4, and 12 for the benefit of a criminal street gang (§ 186.22, subd. (b)), and that, during the commission of the offense charged in count 2, Ortiz personally and intentionally discharged a firearm and proximately caused great bodily injury to the victim (§ 12022.53, subds. (b)–(d)).

In May 2015, the Santa Clara County District Attorney filed an information charging Ortiz with the murder of Phuoc Huong Lam (§ 187; count 1) (case No. C1483831). Count 1 further alleged: A special circumstance for intentionally killing by

---

[1] Unspecified statutory references are to the Penal Code.

2

means of discharging a firearm from a motor vehicle (§ 190.2, subd. (a)(21)); a special circumstance for intentionally killing to further the activities of a criminal street gang (§ 190.2, subd. (a)(22)); a firearm enhancement for personally and intentionally discharging a firearm and proximately causing Lam's death (§ 12022.53, subds. (b)–(d)); a gang enhancement for committing the murder for the benefit of a criminal street gang with the intent to promote criminal conduct by gang members (§ 186.22, subd. (b)(5)); and that Ortiz was 17 years old when he committed the murder (Welf. & Inst. Code, § 707, subd. (b)). In addition, the information charged Ortiz with street terrorism (§ 186.22, subd. (a); count 3).[2]

In June 2015, Ortiz filed a motion under section 995 to dismiss count 3 of the information as well as the gang special circumstance and gang enhancement allegations attendant to count 1. In October 2015, the trial court granted Ortiz's motion.

In February 2016, Ortiz filed another motion under section 995 to dismiss the five charges alleged against him in the indictment. In May 2016, the trial court granted, in part, Ortiz's motion and dismissed the street terrorism offense in count 1 and the conspiracy offense in count 12.

In January 2017, the trial court certified that Ortiz was under the age of 18 at the time of the alleged offenses and ordered that Ortiz be taken before the juvenile court on the indictment and the information.

Following proceedings in the juvenile court, the two cases returned to the trial court in March 2018. The trial court granted the district attorney's motion to consolidate. However, in early August 2018, the district attorney moved to sever the cases. The trial court granted the motion and proceeded to trial on the information (case No. C1483831).

---

[2] The information also charged Daniel Reyes with being an accessory to murder (§ 32; count 2) and with street terrorism (§ 186.22, subd. (a); count 3). Reyes eventually pleaded guilty to count 2, and the district attorney called Reyes as a witness at Ortiz's trial.

In September 2018, the jury acquitted Ortiz of first degree murder but convicted him of second degree murder (§ 187). The jury found true three firearm enhancement allegations (§ 12022.53, subds. (b)–(d)) and the allegation that Ortiz was 17 years old at the time of the offense (Welf. & Inst. Code, § 707, subd. (b)).

A few days after the jury's verdict, Ortiz and the district attorney reached a negotiated disposition on the indictment (case No. 214496). The district attorney moved to amend count 4 (assault with a firearm), and Ortiz pleaded no contest to the lesser offense of assault by means of force likely to cause great bodily injury (§ 245, subd. (a)(4)). In exchange for his plea, Ortiz would receive a concurrent four-year prison sentence and a dismissal of the other counts and the enhancement allegations in the indictment.

On February 1, 2019, the trial court sentenced Ortiz to an indeterminate term of 15 years to life for his second-degree murder conviction (§ 187) and imposed a consecutive 20-year determinate term on one of the three firearm enhancements (§ 12022.53, subd. (c)). The court struck another of the firearm enhancements (§ 12022.53, subds. (d), (h)) and imposed a 10-year term on the third firearm enhancement (§ 12022.53, subd. (b)), but ordered that punishment stayed (§§ 654, 12022.53, subd. (f)). The court also imposed various fines and fees, including a $129.75 criminal justice administration fee to the City of San Jose.[3] Further, in accordance with the plea agreement, the court imposed a concurrent four-year sentence for Ortiz's assault conviction (§ 245, subd. (a)(4)).

Ortiz timely appealed.

---

[3] Although not specified, we presume the trial court imposed the criminal justice administration fee pursuant to former Government Code section 29550 et seq.

B. *Evidence Presented at Trial*

      1. <u>Prosecution Evidence</u>

In May 2014, seventeen-year-old Ortiz was living with his girlfriend Phiana Banuelos and her family.[4]  For about two years previous, Banuelos and Ortiz had an "on and off" relationship that was troubled by jealousy, arguments, and Banuelos's relationship with another person.

On May 5, Banuelos and Ortiz argued, and Ortiz left their home with some of his possessions.  According to Banuelos, she and Ortiz "were planning to break up" on the morning of May 6, and she intended to give back to Ortiz a cell phone he had given her. Banuelos and Ortiz exchanged multiple text messages on May 5 and 6.

On the morning of May 6, Banuelos sent a text to Ortiz telling him that she was not going to give him the phone and instead would drop it off with his mother.  Ortiz responded by threatening to kill Banuelos's family, writing:  " 'You brought something worse than the devil into your house, bitch, and now your whole family's about to pay.' " Banuelos did not take Ortiz's text seriously, although it did upset her.  She told Ortiz that she did not want to end up dead and asked him if he was really going to kill her and her family over their argument.  Later, Ortiz sent a text saying: " 'My words don't mean shit. I wasn't serious.' "  Banuelos responded, " 'I love you, but I can't do this love/hate relationship.  I don't want to end up dead, and I don't want you killing yourself over me.' "

About 10:00 a.m. on May 6, Dieu Hien Thi Huynh and her 37-year-old husband Phuoc Huong Lam were out running errands before Lam had to go to work that afternoon.  As Lam drove his Toyota Camry southbound on Senter Road in San Jose, a Volkswagen Passat (VW) emerged from a mobile home park on Lam's left side and drove toward Lam's car.  Appellant Ortiz was seated in the front passenger's seat of the

---

[4] Unless otherwise indicated, all dates were in 2014.

VW. Ortiz's friend Daniel Reyes was driving the car, and another friend, Anthony Azevedo, was sitting in the backseat. The three men were headed to a park across Senter Road to hang out and smoke. Reyes and Ortiz had been friends since childhood, and Reyes testified at trial that Ortiz's nickname was "Savage."

As the VW crossed Senter Road, it nearly collided with Lam's Camry. The cars came to a stop within feet of each other and at an angle, with the driver's side of the Camry facing the VW's passenger's side. Lam exited his Camry, inspected it, and yelled at the occupants of the VW. According to Huynh, Lam said " 'You know your fault' " and a few other words in English. The men in the VW yelled at Lam, and someone in that car said something like, " 'Fuck you.' " According to Huynh and an independent eyewitness, Angela Hernandez, Lam did not rush, run, or lunge toward the VW. Hernandez testified further that "it looked like the driver" of the VW got out and stood by his door, holding a handgun. Hernandez also testified that Lam was about 10 feet away from the driver of the VW as they yelled at each other.

Reyes testified that no one got out of his VW. According to Reyes, Lam yelled "a bunch of stuff" that sounded like Vietnamese. Reyes thought Lam had "snapped," was "really crazy," and experiencing "road rage." Reyes heard someone, perhaps Ortiz, say " 'Get back.' " Ortiz did not tell Reyes either that Lam had a gun or to not stop their car. Further, Reyes did not find Lam's shouting to be so threatening that Reyes would have felt the need to drive away from the scene. Instead, Reyes, who was unsure at that moment if the cars had actually collided, planned to pull over and exchange insurance information with Lam.[5]

_____

[5] The prosecutor questioned Reyes about statements he had made previously about the incident to detectives while they interviewed him after his arrest in May 2014. Although Reyes testified that he did not recall certain statements he had made, he also said that he was truthful when he spoke to the detectives. The prosecution played clips from Reyes's recorded interview at trial.

6

While Lam was outside his Camry, his wife, Huynh, exited the passenger side to try to get Lam back inside their car. According to Huynh, before she could make it around their car, the shooter (who was sitting in the VW's front passenger seat and had one foot outside his door) shot Lam through an open window as the VW began moving away. Lam fell to the ground facedown near his driver's door. Huynh described the three people in the VW as appearing angry and the shooter as looking "ferocious" and "determined." Huynh testified further that she heard a total of five or six shots.[6] Other prosecution witnesses testified to hearing three or four shots.

Reyes testified that Ortiz fired the shots immediately after the shouting. Reyes had "no idea" why Ortiz shot Lam and believed that "the shooting should [] not have happened." Additionally, during his prior interview with detectives in May 2014, Reyes had said, "I have no idea what snapped into [Ortiz's] brain and he just did it. [¶] . . . [¶] He just did it. He just shot."

After the shooting, Reyes drove away with Ortiz and Azevedo. Reyes testified that he "was pretty confused, shocked, scared, and panicked." Reyes had previously told detectives, "I was scared. And my boy told me, 'Just drive. Just drive.' " Ortiz did not call 911 or say that he should call police to explain the shooting. Wanting to get rid of his car, Reyes left it at an apartment complex called The Woods. Then he, Ortiz, and Azevedo split up.

Meanwhile, San Jose Police Officer Thanh Tong took a recorded statement from Lam (primarily in Vietnamese) as Lam lay inside an ambulance receiving medical care. Tong spoke to Lam to find out what had happened, including to get information about the suspect "and the cause of the shooting." Lam appeared worried and pale, complained

---

[6] The parties stipulated that in a statement Huynh made to police at the scene on May 6, Huynh had said Lam got out of their car and asked why the occupants of the other car pulled in front of him. Huynh had stated further that the front passenger said something in English, leaned out the passenger's side window holding a small gun, and fired approximately four shots. Lam fell, and the car drove away.

7

about being cold, and wanted to talk to his family.  The prosecution played the recording of Lam's statement, and the trial court entered the recording into evidence (People's Exhibit 32).[7]

When talking with Officer Tong, Lam made several statements about the incident, including:  "I was going to tell [the perpetrator], at the time I got out, nothing had happened, he got the gun and shot me."; "I got out, and I stepped out, and I talked to him. And he shoot me [sic]" from inside the car.; The passenger "said, 'I shoot you [sic]' "; and "I didn't understand.  I didn't say anything to him.  I got out to look at my car to see if there were any scratches to the tire."

Additionally, Lam told Officer Tong that he (Lam) was feeling "extremely nauseous," and asked if there was "any medication for a stomach ache?"  Lam then reiterated that he exited his car to see if it had been damaged and the front-seat passenger of the other car shot him.  Lam further told Tong, "I still have to pick up my two children from school oh my God," and asked, "Why is it so hard for me to breath[e] right now?" Lam also asked, "Why am I getting more and more numb like this?" and "Being numb, is something wrong?"  Lam said his whole body felt numb, asked why that was the case, and said that his neck hurt.  Lam told Tong, "My wife had just come out and said, 'Honey see where their car is going,' then they shot me."  The recorded statement concluded with Lam asking for a third time, "Why is my body completely numb?"

Later on the morning of May 6, Ortiz asked Banuelos to pick him up at The Woods.  She did so, picking up both Ortiz and Azevedo.  The two men sat in the back of Banuelos's car whispering to each other.  As Banuelos drove, she saw Ortiz "giggling," "grimace," or laugh "nervous[ly]."

---

[7] The court deferred admission of a transcript provided to the jurors with Vietnamese to English translations (People's Exhibit 32A).  Later, the trial court struck that transcript from the case and admitted a corrected transcript of Lam's statement into evidence (People's Exhibit 41).

8

More than nine hours after being shot, Lam died at a hospital at 7:42 p.m. on May 6, from gunshot wounds to his neck and abdomen. The medical examiner found no evidence that Lam had been shot at close range. There was no soot (burned gunpowder) or stippling (unburned gunpowder) on Lam's body. The medical examiner offered no opinion on Lam's body position at the time of the shooting but acknowledged that Lam could have been bending over. The medical examiner recovered two bullets from Lam's body, one from his neck and another from his lower back. In addition, police found a bullet hole in the Camry's front-driver's side door.

A few weeks after the shooting, Ortiz took Banuelos on a "vacation" to a friend's house in Oakdale. Ortiz brought along a gun, some clothes, and a safe. In Oakdale, Ortiz told Banuelos that he put the safe in a closet and locked the gun in the safe.

On May 23, police executed a search warrant at a house in Oakdale. Officers seized several items including a cell phone and a safe containing a .22-caliber revolver. Police found Ortiz's fingerprints on the revolver. In addition, a firearm examiner determined that one of the two heavily damaged bullets recovered from Lam's body was a "nominal .22 caliber" bullet and said that the seized revolver could have fired that bullet.

On May 24, San Jose Police Department Detectives Ken Tran and Pat Guire interviewed Ortiz. The prosecution played a recording of the interview for the jurors. During that interview, the detectives repeatedly asked Ortiz if he had been involved in an accident on Senter Road, but Ortiz denied any involvement.

Subsequently, while in county jail, Ortiz made several recorded telephone calls. In a call on August 20, 2015, Ortiz said he wanted to "go to prison already" and did not "give a fuck about no lawyer." Ortiz explained, "At the end of the day, it doesn't matter [be]cause the case is the case. The evidence is there, the judge is gonna do what the judge does, the D.A.'s gonna do what the D.A. does."

9

In another jail call on September 14, 2015, Ortiz said, "I'm gonna try to get manslaughter, even if the . . . shit sticks, . . . I'm gonna go for self-defense though."

In an October 5, 2015 jail call, Ortiz said about Reyes, "That fool's getting out." "If he kept his mouth shut, we'll all be out, no record, no nothing."

In an October 12, 2015 jail call, Ortiz told the man on the other end of the line that Reyes and Azevedo had been testifying against him. Ortiz explained, "You should see the shit they [are] talking about though, it's crazy." Ortiz also said, "I'm gonna fight my shit. I'm gonna take my shit to trial and see what happens." The man responded, "That's crazy fool." Ortiz replied, "I know."

2. Defense Evidence

On the morning of May 6, Nghia Tran was driving on Senter Road when he saw what looked like a "small accident" between a VW and a Camry. Tran saw the Asian male driver of the Camry (i.e., Lam) exit his car, followed by a woman. No one exited the VW, which was still rolling. Lam did not appear upset, but Tran heard Lam yell something like, " 'Stop.' " When testifying at trial, Tran first said he was "not sure" if Lam "started moving up toward the VW." Tran also said he saw Lam try to grab the passenger. But Tran acknowledged that he had previously told the police that Lam went up to the VW and grabbed the passenger. The passenger ducked down, and when he came back up, Tran heard three shots. Tran did not hear the passenger say anything. Lam fell to the ground, and the VW drove away fast.

On cross-examination, Tran said he thought Lam "tried to grab [the passenger] and stop" the car, because "he rolling the car and took away [sic]." Tran thought Lam was a threat to the people in the VW, but he did not see Lam reach into the VW, touch the passenger, or do "anything physically to try to stop the Volkswagen." Tran also testified that he did not see Lam do anything that made him (Tran) think the occupants of the VW were in danger.

10

Melissa Chairez testified that she was driving on Senter Road with a passenger (prosecution witness Angela Hernandez) when she (Chairez) heard screeching and saw an apparent accident between two cars on the opposite side of the road. The two cars stopped at an angle to each other; their front ends were touching, and their backs were about five feet apart. Lam exited his car and tried to stop the other car because it was trying to back up. Lam was yelling and upset. He was "[p]robably arm's-length" from the passenger's-side of the other car. The passenger in that car "was hanging out the window." Chairez saw Lam holding the door of the other car, "[be]cause they were backing up . . . trying to go." Chairez saw a hand come out of the car, heard three gunshots, and saw smoke.[8]

The defense called Reyes (the driver of the VW) back to the witness stand. Reyes said he "do[es]n't have a great memory" because he had suffered "three concussions" while in custody. Reyes could not recall telling the detectives during his May 2014 interview that " '[m]y boy told me [to] just drive.' " Additionally, Reyes testified that he thought he had moved his car slowly to the left after the near collision, but he was not attempting to flee the scene. Reyes could not say that Lam had acted "really aggressive," and added, "I didn't see him. All I heard was the yelling." It sounded to Reyes like "aggressive yelling" and Lam had "road rage." Reyes agreed when asked if Ortiz "appear[ed] to be scared [of] Mr. Lam." On cross-examination, Reyes admitted that Ortiz did not say anything about being scared. Reyes said that he "assumed" Ortiz was scared because Reyes had heard Ortiz say, " 'Get back.' "

Ortiz testified in his own defense. Ortiz had turned 17 about three weeks before the shooting. On May 5, Ortiz and Banuelos had a "big argument" about the "usual things, lies, [and] cheating," which were hurtful to Ortiz. Ortiz left their house with the

---

**8** Three other defense witnesses also testified to hearing what sounded like three successive gunshots.

clothes he was wearing, his phone, and his gun.  He did not intend to return to Banuelos's house that night; it was a "final breakup" and "a lot more serious" than usual.

Ortiz met up with Anthony Azevedo, who also had no place to sleep.  They spent the night on the floor of an apartment complex's laundry room.  Ortiz had "broken sleep" that night and argued on and off with Banuelos by text message throughout the night.  Ortiz explained that the harsh language they had used in their text messages was "normal."  Ortiz also said that he was not serious when he threatened to kill Banuelos's family; he had gotten along well with her family and they "actually favored" him when he argued with Banuelos.

On the morning of May 6, Ortiz and Azevedo went to Reyes's house to hang out.  As Reyes drove them to the park, Reyes had a near-accident with Lam's car.  Both cars stopped without touching, and Lam's driver's door and Ortiz's front passenger's door were about eight feet apart.  Ortiz thought the cars were going to get out of each other's way and continue on.

Lam exited his car "angry."  He yelled things at Ortiz "for no reason," like " 'Fuck you.  I'll kill you.  Fuck you.' "  Ortiz saw Lam "reaching for his waistband and that's . . . what scared" Ortiz.  Ortiz had "nowhere [he] could go" because he was wearing his seatbelt and had his car door shut.  While holding his hand out his window, Ortiz told Lam, " 'Back up.  Back up.' "  Ortiz testified that he "d[id]n't know if that pissed [Lam] off more or what, because once [Ortiz] said 'Back up. Back up,' [Lam] just rushed [Ortiz], and, you know, approached the car, closed the space.  That's when [Ortiz] ducked away from the window and [] grabbed the firearm from under the seat and shot."

Ortiz fired three shots out his window.  Lam was "pretty close" to Ortiz, and Ortiz "wasn't aiming specifically at [Lam]" when shooting.  Ortiz explained, "I was scared.  I was trying to get him away from me.  There was really nothing else I could do."  This all happened "very quickly," and Ortiz did not know whether any of his shots had hit Lam.

12

Ortiz testified: I "fired and I looked, he was standing right outside my window; so I got scared and told [Reyes] to drive. I did tell him to drive, but for that reason, I thought this guy must have rushed me or something, he's standing right outside my window, you know." Ortiz further explained, "we drove away because [Lam] was still standing outside my window, I thought the threat was still there, he could still attack me; so I told [Reyes] to drive, and he did."

Reyes, Ortiz, and Azevedo drove to The Woods apartments and split up. Ortiz contacted Banuelos, who picked him and Azevedo up and then dropped Ortiz off at a friend's house. Ortiz testified that he did not go to the police because he believed they would arrest him regardless of what he told them; he did not want to go to jail.

A few hours later, Banuelos picked Ortiz up again, and they went to Banuelos's house. Eventually, Ortiz told Banuelos what had happened during the shooting incident. The defense called Banuelos back to the witness stand after Ortiz. She testified that Ortiz had told her that Lam "was aggressive and he tried to go up to the car and open the door . . . and tried to tell [Ortiz] to . . . get the fuck out of the car and stuff like that, and [Ortiz] told [Lam] to 'Get back' and 'Stay back,' and [Lam] -- I guess [Lam] went back to the car to grab something." Ortiz also said that he thought Lam had a gun.

Ortiz testified further that within a week or two of the shooting, he and Banuelos went to a house in Oakdale that was owned by his friend's sister. Ortiz took his gun with him and kept it in his safe in a closet. Police arrested him there about four days later. When questioned by the detectives, Ortiz did not tell them what had happened because he "knew it didn't matter what [he] said to these guys, regardless, they were going to arrest [him], take [him] to jail," and use anything he said against him.

Ortiz also testified about his jail calls. He explained that he did not want his family to hire him a lawyer because they did not have the money. In addition, he had no faith "in the system here in this county" and did not think he would receive a fair trial. Regarding the call in which Ortiz said he would " 'try to get manslaughter' " and " 'go

13

for self-defense,' " Ortiz explained that his former attorney had told him that " '[w]e're going to go for the self-defense' " and that manslaughter was the "worst case scenario." As for his comments about Reyes and Azevedo, Ortiz said he felt betrayed by his friends.

On cross-examination, Ortiz said he shot Lam because he felt his life was being threatened. He explained that "this shouldn't have happened, you now, [Lam] shouldn't have jumped out, threatened me, and attacked me the way he did." Ortiz admitted that Lam did not attack him physically or "get to grab [him]." Regarding his interview with detectives, Ortiz said that it was not his intention to lie when he told the detectives he did not know what they were talking about. He did not want to talk about the incident or incriminate himself. When asked if he decided to "go for self-defense in September of 2015," Ortiz stated, "I went for self-defense since the day it happened, since the day I got here. It's nothing new. I told my girlfriend this. I've told family this. It's before my arrest. It's nothing new."

## II. DISCUSSION

We first consider the scope of our jurisdiction.

In the caption of his notice of appeal, Ortiz listed both trial court case Nos. C1483831 and 214496. However, in the body of his notice, Ortiz specified only that he was "appeal[ing] from the judgment and sentence rendered on February l, 2019 *following conviction after jury trial*." (Italics added.) Furthermore, as Ortiz concedes in his opening brief to this court, no certificate of probable cause was sought or issued as to the judgment of conviction resulting from his no-contest plea to assault in case No. 214496. Additionally, Ortiz raises no claim of error to this court regarding his judgment of conviction in that case. Under these circumstances, we conclude that we have no jurisdiction over the judgment in case No. 214496 and do not further address it. (See *People v. Mendez* (1999) 19 Cal.4th 1084, 1094.)

With respect to the appeal from the judgment on the information (case No. C1483831), Ortiz raises four claims in his opening brief. He contends: (1) the trial court

14

erred in admitting Lam's recorded statement as a "dying declaration" under the Evidence Code, (2) the trial court's error further violated Ortiz's rights under the Sixth Amendment's confrontation clause, (3) the trial court erred by permitting the introduction of evidence of Ortiz's nicknames " 'Sav' " and " 'Savage,' " and (4) the cumulative prejudice from the trial court's errors violated Ortiz's right to a fair trial.

In supplemental briefing, Ortiz contends that we should order the trial court to amend the judgment, pursuant to Assembly Bill No. 1869 (2019-2020 Reg. Sess.) (Assembly Bill 1869), to vacate a criminal justice administration fee imposed at his sentencing.

We address Ortiz's claims in turn.

A.  *Admission of Dying Declaration*

Ortiz contends the trial court failed to exercise informed discretion when it initially ruled, based on an inaccurate translation and transcript, that Lam's statement to police after the shooting was admissible as a dying declaration under section 1242 of the Evidence Code.  Ortiz further asserts that the trial court abused its discretion when it subsequently refused to strike the evidence of Lam's statement after it became known that the original transcript contained material errors.  Ortiz contends that the trial court's erroneous ruling violated his due process right to a fair trial and was prejudicial under both *Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*) and *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*).

The Attorney General counters that the trial court did not abuse its discretion in admitting Lam's statement as a dying declaration and, regardless, any error is one of state law that was harmless.

1.  Additional Background

Pretrial, the prosecutor filed a motion in limine seeking to introduce, as a dying declaration, the recorded statement that Phuoc Lam made to Officer Thanh Tong while Lam was being rushed to a hospital.  The prosecutor argued that, although "Mr. Lam did

15

not expressly say he believed his death was impending[,] . . . this belief can be inferred from the circumstances and the statement. Mr. Lam describes feeling numb throughout his body, and says 'I have children, two children, am I going, heaven and earth, oh. . . .' " The prosecutor asked to introduce at trial both the recording of Lam's statement (which Lam had made mostly in Vietnamese) and a transcript with Vietnamese to English translations.

At a pretrial proceeding, the parties and trial court discussed Lam's statement and potential redactions to it. Ortiz's trial counsel questioned whether Lam had a sense of impending death. The trial court responded that in the statement Lam "does, at some point, talk about going to heaven and earth."[9] The court stated further, "To the extent that you're objecting that it's insufficient foundation for a dying declaration, the objection [is] overruled. I think that there's going to be, I presume, foundation that this is immediately after the event, possibly in the ambulance."

As the parties continued to discuss possible redactions from Lam's statement, Ortiz's trial counsel reiterated his concern that Lam did not have a sense of immediately impending death. Counsel asserted that Lam's statement about " 'being numb' " and asking " 'Is something wrong?' " "doesn't sound like he's dying." Counsel also noted that Lam did not die until later that day, while in surgery. Counsel objected again to admission of Lam's statement as a dying declaration. The trial court overruled the objection, concluding that there was sufficient support for admitting the statement.

Later that same court day, Ortiz's trial counsel added to his objection the fact that the coroner's report indicated a bullet had been removed from Lam's spine, "which

---

[9] The transcript relied on by the court at this point in the case was an unredacted version of People's Exhibit 32A. That transcript includes the translated statement noted by the prosecutor in his motion, i.e., " 'I have children, two children, am I going, heaven and earth, oh . . . .' "

16

would account for the feeling of paralysis." The trial court responded, "It does not change my ruling."

During trial, Ortiz's counsel again challenged the admissibility of Lam's statement. Counsel asserted there was "no imminent death," but there was evidence that Lam "was stabilized." Counsel asked the court to defer admission of Lam's statement pending additional evidence regarding Lam's subsequent medical treatment and death. The court declined to change or defer its admissibility ruling and invited counsel to reraise the issue if something additional arose that rendered the court's ruling incorrect.

The next day, during Officer Tong's testimony, the prosecutor played the recording of Lam's statement (People's Exhibit 32) and provided the jurors a transcript with translations (People's Exhibit 32A). The trial court told the jurors that "the transcript is just an aid to help [them] listen. The evidence is the tape -- or CD." Although the court admitted the recording into evidence, it deferred ruling on admission of the transcript. As discussed, *ante* (section I.B.1.), Lam told Officer Tong that Ortiz had shot him without provocation.

Shortly after the recording was played, the trial court reiterated its ruling that Lam's statement qualified as a dying declaration because "it was given with a sense of impending death." The court asked if the defense had been provided a certification for the translations in the transcript. Trial counsel said he had not seen one but would accept the certification if it were provided. The court told the prosecutor to provide the certification or, alternatively, call Officer Tong back to the witness stand to confirm the accuracy of the transcript. The court continued to defer its ruling on admission of People's Exhibit 32A.

The next day, the parties and trial court again discussed the transcript. The court reviewed the transcript and said that everything it had ordered redacted had been removed. The court further stated that "[People's Exhibit] 32A can come in. The jury has heard it, and . . . they will get the translation." Regarding the certification of the

translation, the prosecutor explained that it had "always been [his] understanding" that translated transcripts prepared for the district attorney's office were "prepared by people certified in those languages." However, after inquiring about People's Exhibit 32A, the prosecutor discovered that he did "not have a certification for this particular transcript or transcriptionist." The prosecutor proposed asking Detective Ken Tran (who was a certified Vietnamese interpreter) to listen to the admitted recording and compare it to People's Exhibit 32A to determine if the transcript was accurate. The court said that was acceptable.

The next court day, the prosecutor informed the trial court that Detective Tran had reviewed the recording and People's Exhibit 32A, found errors in the translation and transcript, and corrected them. The corrected transcript included changes to both the transcribed Vietnamese text and the related translations. Trial counsel objected to admission of the corrected transcript because the original, erroneous transcript had been provided to the jurors when the recording was played in court. Counsel also noted that the corrected transcript was "quite different" with regard to the issue of imminent death. The court acknowledged that Detective Tran's transcription/translation did not include Lam saying, "I have children, two children, am I going, heaven and earth, oh." According to Tran's transcription/translation, Lam instead said, "I still have to pick up my two children from school oh my God." Other changes made by Tran included correcting what had been transcribed as a mostly "inaudible" statement to Lam asking, "Why is it so hard for me to breath[e] right now?", and changing Lam's final statement from, "Finished already, I feel my whole body numb like this now," to "Why is my body completely numb?"

Trial counsel argued that the change made to the originally included "heaven and earth" comment undermined the trial court's ruling that Lam had made his statement under a sense of impending death. Counsel further asserted that Lam's feeling of

numbness likely resulted from a bullet hitting his spinal cord and "there's nothing saying that he had perceived he was imminently going to die. He lived for another ten hours."

The trial court acknowledged that it had previously relied on the "reference to heaven and earth," but said it "used the totality of the circumstances surrounding the giving of the statement in making [its] ruling that it was admissible as a dying declaration." The court continued, "I believe it was a sense of impending death when he's talking about, 'I'm numb all over, I'm' -- you know, 'Why is this? Why is this happening?" and so forth. 'My wife. My wife. Why is my entire body numb? Why is my body completely numb? Why is it so hard for me to breathe right now?' [¶] So I guess the long and short of it is [] that I don't believe the change in the translation changes my ruling. I still believe it's a dying declaration."

Later, the trial court instructed the jurors that it was striking the original transcript of Lam's recorded statement from the case because it was not prepared by a certified translator. Detective Tran then testified that he had listened to the recording and made multiple major corrections to the original transcript. He testified further that his corrected transcript was accurate. The court then admitted the corrected transcript with Vietnamese to English translations into evidence (People's Exhibit 41).

The trial court provided the admitted exhibits to the jury during its deliberation.

2. Legal Principles

Evidence Code section 1242 provides: "Evidence of a statement made by a dying person respecting the cause and circumstances of his death is not made inadmissible by the hearsay rule if the statement was made upon his personal knowledge and under a sense of immediately impending death." (Evid. Code, § 1242.) " ' "This sense of impending death may be shown in any satisfactory mode, by the express language of the declarant, or be inspired from his evident danger, or the opinions of medical or other attendants stated to him, or from his conduct, or other circumstances in the case, all of which are resorted to in order to ascertain the state of the declarant's mind." ' " (*People*

19

*v. Monterroso* (2004) 34 Cal.4th 743, 763 (*Monterroso*), quoting *People v. Tahl* (1967) 65 Cal.2d 719, 725.)

We review a trial court's ruling on the admissibility of a statement as a dying declaration under the abuse of discretion standard. (*Monterroso*, *supra*, 34 Cal.4th at p. 763; *People v. Mayo* (2006) 140 Cal.App.4th 535, 553 (*Mayo*).) We cannot disturb a trial court's evidentiary ruling under this standard unless it is shown that the trial court exercised its discretion in an arbitrary, capricious, or absurd manner that resulted in a manifest miscarriage of justice. (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1124, abrogation on other grounds recognized by *People v. Leon* (2020) 8 Cal.5th 831, 848.)

Furthermore, we review a trial court's findings of foundational facts—such as whether the declarant had a sense of impending death—for substantial evidence. (See *People v. Sims* (1993) 5 Cal.4th 405, 459 (*Sims*); see also *People v. Merriman* (2014) 60 Cal.4th 1, 65–66 (*Merriman*).)

"[W]hen evidence is properly admitted under the Evidence Code, there is no violation of due process." (*People v. Johnson* (2015) 61 Cal.4th 734, 763 (*Johnson*).) "[T]he admission of evidence in violation of state law may [] violate due process, but only if the error rendered the defendant's trial fundamentally unfair." (*Merriman*, *supra*, 60 Cal.4th at p. 70.)

We review an error in admitting hearsay in violation of state evidentiary rules for prejudice under *Watson*'s reasonable probability standard. (*Merriman*, *supra*, 60 Cal.4th at p. 69; *People v. Seumanu* (2015) 61 Cal.4th 1293, 1308; see also *People v. Valencia* (2021) 11 Cal.5th 818, 840.)

### 3. Analysis

We are not convinced that the trial court erred by admitting Lam's statement to Officer Tong as a dying declaration. Regarding Ortiz's assertion that the trial court's initial decision to admit the statement was not an informed exercise of discretion, Ortiz offers no specific argument about how he was harmed by that initial decision. That is,

Ortiz makes no argument that he suffered any prejudice as a result of the jury reading the transcript containing the incorrect translation as it listened to the recording during Tong's testimony.  Rather, Ortiz argues more generally that the trial court's initial ruling put it "in a logical box" when it later had to strike the incorrect translation from the record and reconsider its initial ruling in light of the corrected translation.  Because the trial court struck the incorrect translation from the record and Ortiz fails to make any argument as to how it affected the result of his trial, we reject any assertion of prejudicial error resulting directly from the trial court's initial ruling.

Turning to Ortiz's challenge to the trial court's ultimate ruling that Lam's statement qualified as a dying declaration, we are not convinced that that decision amounts to an abuse of discretion or was unsupported by substantial evidence.  The record shows that the trial court carefully reviewed and considered the differences between the incorrect and corrected transcript when reconsidering its initial ruling.  We see no basis in this record to conclude that the trial court felt compelled to adhere to its initial ruling or was otherwise insincere when it said it still believed Lam's statement qualified as a dying declaration.

Furthermore, there is support in this record for the trial court's decision.  The requirement of a "sense of immediately impending death" (Evid. Code, § 1242) "may be shown by the declarant's own statements to that effect, or inferred from circumstances such as the declarant's physical condition, the extent of his injuries, his knowledge of his condition, and other types of statements made by the declarant." (*Sims*, *supra*, 5 Cal.4th at p. 458.)  Here, Lam made his statement after being shot twice and while being attended to by emergency medical personnel in an ambulance.  Less than midway through his statement, Lam complained of being extremely nauseous and asked if there was any medication he could be given for his stomach ache.  About three-quarters of the way through his statement, Lam spoke of having to still pick up his kids from school, and said "oh my God."  Lam also asked why he was having trouble breathing.  He then repeatedly

21

asked why he was feeling numb and mentioned that his neck hurt. During this part of the statement, when Officer Tong asked if the numbness was "just the medication," someone else—presumably one of the EMTs in the ambulance—said, "No, I haven't given him any meds." Under these circumstances, we conclude the trial court acted reasonably and did not abuse its discretion in determining that Lam believed he was going to die from his injuries when he was speaking with Officer Tong. (See *Mayo*, *supra*, 140 Cal.App.4th at p. 554.) We also conclude that the admission of Lam's statement did not violate Ortiz's right to a fair trial. (See *Johnson*, *supra*, 61 Cal.4th at p. 763.)

Even assuming the trial court erred by admitting Lam's recorded statement as a dying declaration, it is not reasonably probable that, but for the error, the jury would have reached a verdict more favorable to Ortiz. (*Watson*, *supra*, 46 Cal.2d at p. 836.) "[T]he *Watson* test for harmless error 'focuses not on what a reasonable jury *could* do, but what such a jury is *likely* to have done in the absence of the error under consideration. In making that evaluation, an appellate court may consider, among other things, whether the evidence supporting the existing judgment is so *relatively* strong, and the evidence supporting a different outcome is so *comparatively* weak, that there is no reasonable probability the error of which the defendant complains affected the result.' " (*People v. Beltran* (2013) 56 Cal.4th 935, 956.)

In the present case, the prosecution urged the jurors to convict Ortiz of first degree murder because Ortiz shot Lam from a vehicle with an intent to kill. The jury, however, convicted Ortiz of second degree murder, presumably on a theory of implied malice. By its verdict, the jury rejected that Ortiz acted in self-defense, acted in imperfect self-defense, or acted because of a sudden quarrel or in the heat of passion. Additionally, the jury was instructed on and did not return a verdict for involuntary manslaughter.

When speaking with Officer Tong in the ambulance, Lam stated that he had gotten out of his car to check for any damage and was going to tell Ortiz "nothing had happened." But Ortiz "got the gun and shot [him]." Lam stated that Ortiz said he was

22

going to " 'shoot' " him, but Lam "didn't understand" and "didn't say anything to [Ortiz]."

On appeal, Ortiz's assertion of prejudicial error goes not to Ortiz's identity as the shooter, but to whether Ortiz acted in self-defense. Although it is true Lam's statement to Officer Tong bolstered the prosecution's contention that Lam did not provoke Ortiz or give him reason to shoot Lam in either perfect or imperfect self-defense, there was ample evidence supporting the conclusion that Lam did not act in such a manner before Ortiz shot him. In other words, the prosecution's evidence countering Ortiz's defense would have remained strong even if Lam's statement had been excluded.

Critically, there was no evidence (other than Ortiz's own testimony and statement to his girlfriend) that Lam appeared to have or reach for a gun or any kind of weapon. In addition, the jury heard from a number of witnesses that Lam did not threaten the occupants of the VW, who were all still inside the car. Lam's wife and an uninvolved eyewitness, Angela Hernandez, testified consistently that Lam did not rush, run, or lunge toward the VW. To Hernandez, it did not look like Lam was about to attack or posed a threat to Ortiz. Moreover, although Daniel Reyes described Lam as snapping and acting "really crazy" and heard Ortiz say " '[g]et back,' " Reyes also testified that Lam's shouting was not so threatening that Reyes would have felt the need to flee from Lam. Reyes testified further that Ortiz did not tell him to avoid stopping the car or say anything about Lam having a gun. From Reyes's perspective, "th[e] shooting should not have happened."

By contrast to the prosecution's evidence, the defense evidence supporting self-defense or provocation was relatively weak. Nghia Tran's testimony about seeing Lam approach the VW and grab the passenger was undermined by Ortiz's admission that Lam "didn't get to grab [him]." Tran's testimony also was equivocal on whether he thought Lam was a threat to the men in the VW. Similarly, defense witness Melissa Chairez testified that she only saw Lam holding the door of the VW as it was attempting to back

23

away from the scene—not that Lam touched anyone in the VW.  Moreover, no independent evidence supported Ortiz's testimony that Lam reached for his waistband or verbally threatened to kill Ortiz during the incident.  In addition, the evidence of Ortiz's flight, various other actions, and statements both before and after the shooting supported the prosecution's position that Ortiz's testimony about self-defense lacked credibility.

For these reasons, we conclude that there is no reasonable probability the result of Ortiz's trial would have been more favorable to Ortiz if the jury had not been provided Lam's statement to Officer Tong.  We also conclude that there was no fundamental unfairness in Ortiz's trial because Lam's statement, of itself, was not exceptionally prejudicial.  (See *Merriman*, *supra*, 60 Cal.4th at p. 70; see also *Jammal v. Van de Kamp* (9th Cir. 1991) 926 F.2d 918, 920; cf. *People v. Albarran* (2007) 149 Cal.App.4th 214, 230–232.)  Accordingly, we reject Ortiz's claim that the admission of Lam's statement as a dying declaration was error and requires reversal of his murder conviction.

B.  *Confrontation Clause Challenge to Dying Declaration*

Ortiz acknowledges that the California Supreme Court has previously rejected several Sixth Amendment confrontation clause challenges to the admission of a dying declaration.  (See *Monterroso*, *supra*, 34 Cal.4th at pp. 763–765; *People v. D'Arcy* (2010) 48 Cal.4th 257, 290–292; *Johnson*, *supra*, 61 Cal.4th at pp. 761–762.)  Nevertheless, Ortiz contends Lam's statement to Officer Tong is testimonial hearsay and its admission impinged on his confrontation right under *Crawford v. Washington* (2004) 541 U.S. 36.  Ortiz further concedes that he raises this claim in order to preserve it for presentation to a court higher than ours.

Because Ortiz's claim of error is foreclosed in this court by our Supreme Court's precedent, we must deny it.  (See *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

24

C. *Admission of Ortiz's Nicknames*

Ortiz contends the trial court prejudicially erred under state law and violated his constitutional rights to due process, a fair trial, and a reliable guilt determination by permitting the prosecution to introduce evidence that his nicknames included " 'Sav' " and " 'Savage.' "

The Attorney General counters that the trial court did not abuse its discretion, there was no fundamental unfairness or federal constitutional error here, and, regardless, Ortiz cannot show prejudice resulting from any error.

### 1. Additional Background

Pretrial, Ortiz moved in limine to preclude the prosecution from referring to him "as 'Sav' or 'Lil Sav,' " because the names "serve[d] no useful end and could only prejudice him." (Bolding omitted.)

During a pretrial proceeding, the prosecutor stated his intention to present evidence that Ortiz's "moniker is Sav or Little Sav." The prosecutor argued that the evidence was relevant to identification—because Ortiz's nickname appeared in Daniel Reyes's cell phone records—and to Ortiz's intent during the shooting. The prosecutor explained that "Sav is short for 'savage' " and "the fact that [Ortiz] calls himself Little Savage indicates that he has a state of mind where he embraces violence, where he basically portrays himself to his friends and to the world as a savage person. And quite frankly, shooting someone and killing them over a minor accident is a savage act." The prosecutor also noted that the defense was "choosing to put Mr. Ortiz's state of mind at issue" by asserting self-defense.

Ortiz's trial counsel countered that the proposed evidence was irrelevant, prejudicial "character evidence," and the prosecution's intent argument was based on "pure speculation" about how Ortiz got his nickname. Counsel offered that Ortiz had acquired the nickname "when he was a kid, he used to get into a lot of fights."

25

The trial court stated: "So I think that trying to . . . put on the defendant that he is trying to portray to the world that he's savage in his actions or behavior is going too far, and I don't think it has a lot of probative value with regard to his state of mind." The court further explained: "I think that under the circumstances, . . . if the person in a cell phone has [Ortiz] listed as Sav or Little Sav, and it's relevant to show that he had contact with that person or knew that person or whatever, use of those nicknames is admissible, okay? But not to make that step and say that because his name is Little Sav, that means he engages in savage acts, right?" When trial counsel responded by stating that the parties could not "say Little Sav is short for savage," the court replied, "No. Unless . . . somebody has Savage with [Ortiz's] phone number. [¶] . . . [¶] So Sav and Little Sav." The prosecutor then asked about cross-examining Ortiz regarding "the fact that this is his nickname." The court replied that the prosecutor could do so.

Near the beginning of the prosecutor's direct examination of Reyes, the prosecutor elicited that Reyes had known Ortiz since they were "little kids." The prosecutor then asked whether Ortiz had a nickname. Trial counsel objected to the question and the trial court sustained the objection. The prosecutor requested a sidebar. After an unrecorded sidebar, the court reversed its ruling, and the prosecutor asked Reyes "what was Mr. Ortiz's nickname?" Reyes answered, "Savage, I believe." The prosecutor continued, "Was [Ortiz] sometimes called Sav, rather than Savage?" Reyes replied, "At this moment, I don't recall." Thereafter the prosecutor asked Reyes if he remembered how he had Ortiz listed as a contact in his cell phone. Reyes said he did not remember. Trial counsel did not object to any of the prosecutor's questions or Reyes's answers after the court overruled the initial objection.

The next day, the parties and the trial court discussed records generated from Reyes's cell phone which showed his contact with Ortiz "under the name of Sav" on the day of the crime. Trial counsel objected to admission of the records, arguing that "Sav" had no relevance to any issue in the case given there was no dispute that Reyes and Ortiz

26

were together in Reyes's car. Counsel also maintained that " 'Sav' " was prejudicial and, along with some other nicknames appearing in the records, "gives gang connotations." The court admitted two pages of the cell phone records (from May 5 and 6) and ordered the prosecutor to redact a reference to another nickname, " 'Lalo.' "

Several days later, during the prosecutor's cross-examination of Ortiz, the prosecutor asked whether Ortiz thought Phuong Lam had disrespected him. After Ortiz rejected that notion and that he wanted to "look tough" in front of his "buddies," the prosecutor asked, "Well, you shot Mr. Lam because you're a savage; right?" Ortiz replied, "No." As the prosecutor asked his next question, "Well, that's how you --," trial counsel interrupted with an objection. The trial court sustained the objection and instructed the jurors to "[d]isregard that." When the prosecutor continued, "Well, your image --," counsel interrupted again, objecting on "[c]haracter evidence" grounds. Regarding this objection, the court told the prosecutor to rephrase his question. The prosecutor did so, asking Ortiz whether the way he portrayed himself to his friends was important to him. Ortiz responded, "I guess, in a sense, yes." The prosecutor then asked if Ortiz portrayed himself as "tough guy." Ortiz replied, "I wouldn't say a tough guy. . . . I don't try to look like a tough guy or whatever you're trying to say." After Ortiz answered "[n]o" to a follow-up question about whether he did anything to appear or act like a tough guy in front of his friends, counsel objected again on "[c]haracter" and relevance grounds. The court did not state a ruling on that objection; instead, the court adjourned for lunch.

Thereafter, the parties and trial court engaged in a lengthy discussion that began with trial counsel stating his concern that the prosecutor was "attempting to go against the Court's ruling not to bring in the nickname Savage" and "going into character evidence as to [Ortiz's] . . . propensity to commit violence." The prosecutor said he was not introducing character evidence and reiterated his position that how Ortiz "portrayed himself, if he held himself out to be a savage," was "relevant to a self-defense claim."

27

The prosecutor also mentioned that Ortiz referred to himself on social media as " 'Lil Savage Ortiz.' " The court stated that the prosecutor "can't ask [Ortiz] if he does anything to try to appear or act like a tough guy" because "that's too close to" evidence of a person's character under Evidence Code section 1101.

Regarding Ortiz's social media handle, the trial court stated that "it has some relevance to mental state" and the prosecutor could "argue that [Ortiz] believed himself to be a little savage." The court further said, "I'm going to allow [the prosecutor] to put in evidence that [Ortiz's] Facebook page is Little Savage. I don't think it's unduly prejudicial, because [the jurors] already heard that other people refer to [Ortiz] by that nickname. . . . They've heard that [] was in Reyes'[s] phone."

Despite the trial court's apparent ruling that the prosecutor could ask Ortiz about his social media handle, the prosecutor did not subsequently ask Ortiz any questions about his social media presence, including his use of the moniker "Little Savage."

2. Legal Principles

Only relevant evidence is admissible at trial. (Evid. Code, § 350.) " ' "The test of relevance is whether the evidence tends 'logically, naturally, and by reasonable inference' to establish material facts such as identity, intent, or motive." ' " (*People v. Jones* (2013) 57 Cal.4th 899, 947 (*Jones*); see also Evid. Code, § 210.)

"A trial court has 'considerable discretion' in determining the relevance of evidence. [Citation.] Similarly, the court has broad discretion under Evidence Code section 352 to exclude even relevant evidence if it determines the probative value of the evidence is substantially outweighed by its possible prejudicial effects."[10] (*Merriman*, *supra*, 60 Cal.4th at p. 74.)

_____

[10] Evidence Code section 352 provides: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352.)

Evidence Code section 352 " 'requires the exclusion of evidence only when its probative value is *substantially* outweighed by its prejudicial effect. "Evidence is substantially more prejudicial than probative [citation] [only] if, broadly stated, it poses an intolerable 'risk to the fairness of the proceedings or the reliability of the outcome.' " ' " (*Jones*, *supra*, 57 Cal.4th at p. 948.) " 'The admission of relevant evidence will not offend due process unless the evidence is so prejudicial as to render the defendant's trial fundamentally unfair.' " (*Id.* at p. 949.)

"An appellate court reviews a court's rulings regarding relevancy and admissibility under Evidence Code section 352 for abuse of discretion. [Citation.] We will not reverse a court's ruling on such matters unless it is shown ' "the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice." ' " (*Merriman*, *supra*, 60 Cal.4th at p. 74.)

We assess whether a defendant was prejudiced by the admission of irrelevant evidence in violation of state evidentiary rules under the standard set forth in *Watson*. (See *People v. Benavides* (2005) 35 Cal.4th 69, 91; *People v. Brown* (2003) 31 Cal.4th 518, 551.)

### 3. Analysis

The parties disagree as to whether the admission of evidence about Ortiz's nicknames, " 'Sav' " and " 'Savage,' " violated state evidentiary law and federal constitutional protections. We need not decide this dispute because, even assuming the trial court erred by admitting the nickname evidence, such error was harmless under even *Chapman*'s more rigorous standard of prejudice for constitutional error.

Here, the nickname evidence was minimal and not a prominent part of the prosecution's case. Although Reyes testified to his belief that Ortiz had the nickname "Savage," Reyes said he could not recall if Ortiz was sometimes called "Sav" or how Ortiz was listed as a contact in his phone. Reyes's limited recall regarding Ortiz's nicknames suggests they were not very important, thus likely reducing the effect Reyes's

29

testimony and phone records had on the jurors. Further, as for the prosecutor's question about Ortiz shooting Lam because he is a savage, the evidence elicited by the prosecutor did not significantly promote the prosecutor's effort to show that the killing was not justified or that Ortiz was not provoked. Ortiz categorically denied shooting Lam because he (Ortiz) is "a savage." He also denied that he "try[s] to look like a tough guy" or did anything to act like a tough guy in front of his friends. Ortiz's denials were not countered with any specific evidence (beyond the facts of the crime generally) that Ortiz was motivated by an alleged savage nature when he shot Lam. Additionally, the prosecutor did not mention in his closing argument the evidence about Ortiz's "Sav" or "Savage" nickname or the use of the word "savage." Under these circumstances, the significance of the nickname evidence is exceptionally slight in comparison to the copious evidence supporting that Ortiz killed Lam with implied malice and not in self-defense or as a result of provocation.

For these reasons, we conclude any error in admitting evidence of Ortiz's nicknames was harmless beyond a reasonable doubt. (See *Chapman*, *supra*, 386 U.S. at p. 24.)

D. *Cumulative Error*

Ortiz contends the cumulative effect of the two evidentiary errors he asserts on appeal prejudiced him and requires reversal.

" 'The "litmus test" for cumulative error "is whether defendant received due process and a fair trial." ' " (*People v. Poletti* (2015) 240 Cal.App.4th 1191, 1217.) Assuming error for Ortiz's claims, and considering the reasons explained *ante* for the lack of prejudice as to each claim, we determine that the errors do not compound to amount to a miscarriage of justice. (*Ibid.*) Accordingly, we reject Ortiz's claim of cumulative error.

E. *Criminal Justice Administration Fee*

"On September 18, 2020, the Governor signed Assembly Bill No. 1869 . . . [¶] . . . [which] abrogated the authority to impose and collect 23 different administrative fees, including, as relevant here, . . . the criminal justice administration fee." (*People v. Greeley* (2021) 70 Cal.App.5th 609, 625 (*Greeley*).) Assembly Bill No. 1869 added section 6111 to the Government Code. (Stats. 2020, ch. 92, § 11.) "Relevant to the criminal justice administration fee, Government Code section 6111 provides, 'On and after July 1, 2021, the unpaid balance of any court-imposed costs pursuant to [Government Code] [s]ection 27712, subdivision (c) or (f) of [Government Code] [s]ection 29550, and [Government Code] [s]ections 29550.1, 29550.2, and 29550.3, as those sections read on June 30, 2021, is unenforceable and uncollectible and any portion of a judgment imposing those costs shall be vacated.' " (*Greeley*, at pp. 625–626.)

Because this change in the law became effective after the parties had submitted their briefs in this matter, we invited supplemental briefing on the effect of Government Code section 6111 on this appeal. In his supplemental letter brief, Ortiz requests that we order the trial court to amend the abstract of judgment to vacate the portion of the $129.75 criminal justice administration fee imposed at his sentencing under Government Code section 29550 et seq. Likewise, the Attorney General concedes that Government Code section 6111 applies here and states that this court should strike the criminal justice administration fee.

We agree with the parties that Government Code section 6111 applies to this matter, the unpaid balance of the criminal justice administration fee is unenforceable and uncollectible, and the portion of the judgment imposing that fee must be vacated. (See *Greeley*, *supra*, 70 Cal.App.5th at pp. 626–627; *People v. Lopez-Vinck* (2021) 68 Cal.App.5th 945, 953–954.) Thus, we will modify the judgment as required by the new law and direct the trial court to prepare a new abstract of judgment reflecting the modification.

31

## III. DISPOSITION

The judgment in case No. C1483831 is modified to vacate any portion of the $129.75 criminal justice administration fee that remained unpaid as of July 1, 2021. As so modified, the judgment is affirmed. The clerk of the superior court is ordered to prepare a new abstract of judgment reflecting that modification and forward a copy of the amended abstract of judgment to the Department of Corrections and Rehabilitation.

_____

               Danner, J.

WE CONCUR:

_____

Elia, Acting P.J.

_____

Grover, J.

**H046704**
***People v. Ortiz***